458 P.2d 974

**STATE of Arizona, Appellee,**

v.

**Charles KEEVER, Appellant.**

**No. 1 CA-CR 172.**

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 17, 1969.

Rehearing Denied Oct. 20, 1969.

Review Denied Dec. 2, 1969.

Stewart & Pickrell, Harry A. Stewart, Jr., Phoenix, for appellant.

Gary K. Nelson, Atty., Gen., by Carl Waag, Sp. Asst. Atty. Gen., for appellee.

STEVENS, Judge.

 The information charged an illegal abortion, A.R.S. § 13-211. The date of the alleged offense was stated to be on or about 12 February 1966. Defendant was a duly licensed practicing medical doctor. The prosecutrix was a 20-year old Go-Go dancer, married, and the mother of two full-term naturally born children. The verdict and judgment were "guilty". The defendant was placed on probation and appealed. An appeal lies under these circumstances. State v. Veres, 7 Ariz.App. 117, 436 P.2d 629 (1968), review denied.

The trial was long and it was well and vigorously presented by both sides. The appeal raises many interesting legal points which we need not decide in view of the opinion we have reached.

Article II of Title 13 of the Arizona Revised Statutes is entitled "Abortion." Section 13-211 reads as follows:

"A person who provides, supplies or administers to a pregnant woman, or procures such woman to take any medicine, drugs or substance, or uses or employs

any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless it is necessary to save her life, shall be punished by imprisonment in the state prison for not less than two years nor more than five years."

Under the evidence presented, if the offense charged was proven, it was accomplished by the use of instruments. The essential elements which were required to be established, each beyond a reasonable doubt, were:

1. that the prosecutrix was pregnant;

2. that instruments were used by the defendant;

3. that the defendant used the instruments with the intent to procure a miscarriage; and

4. that the procedures used were not necessary to save the life of the prosecutrix.

The defendant testified that he performed a vaginal examination of the prosecutrix and there were instruments used in conducting the examination. The prosecutrix testifed that instruments were used. She was unable to identify or describe them.

The first question to be resolved is whether, at the time in question, the prosecutrix was pregnant. We must examine the evidence in the light most favorable to sustaining the verdict and the judgment of guilt. Many of the matters which are stated as fact in this opinion when approached from this point of view were seriously contested at the time of the trial. We believe that some of the details of the testimony may be omitted and that it is sufficient to state generally portions of the evidence.

In the fall months of 1965, the prosecutrix was a married woman. She had previously given natural birth to two full-term children. Her age was then 20 years. She worked as a Go-Go dancer in a local bar. She was generous with men in the use of her body. For a time in the fall of that year she used oral contraceptive pills. By mid-December of 1965 her use of the pills was inadequate in number and irregular in time. Her last menses was about mid-December. Her intimate association with men not her husband continued without the use of contraceptive devices. She experienced symptoms of pregnancy such as frequent urination, the enlargement of her breasts and some morning nausea. She had experienced the same symptoms during her prior pregnancies. She believed herself to be pregnant. Without disclosing her symptoms, she called upon a local doctor, not the defendant in this cause, who sent her to a laboratory for a Gravindex test. The test was conducted on 4 February 1966, and the result was positive for pregnancy. The Gravindex test seeks to determine the presence or absence of a hormone called "human chorionic gonadotropin" often referred to as the HCG. This hormone is produced during pregnancy.

Thereafter, her employer contacted the defendant by telephone and made an appointment for an office meeting between the defendant and the prosecutrix. The testimony of the employer as to the preliminary conversation strongly suggests that the employer advised the defendant that the prosecutrix was pregnant and that the defendant said that he could take care of it. There was testimony as to an agreed fee and that the agreed fee was paid. We must again bear in mind that much of the evidence for the State was sharply contested.

On 12 February 1966, the prosecutrix and her employer went to the defendant's office. She testified that shortly after arriving at the defendant's office, she had a conversation with him, in part, as follows:

"A. The doctor asked me about how far along I thought I was. And I told him that I thought maybe two months. And I asked him if that was too far along, and he said no."

She testified she was then administered two cc's of Demerol, a pain killing drug. She was placed upon an examining table with her legs spread in the position which the witnesses agreed was the usual position for

a pelvic examination. She was draped and could not see the instruments actually used by the defendant. The prosecutrix testified that she "felt a stretching sensation * * * in the vaginal area * * * then * * * I felt tugging and sort of a pulling-down sensation, like my insides were being lowered a little bit." In response to a question as to the degree of pain she stated:

"A. It sort of elevated itself in degrees until the tugging and that was the most discomforting feeling."

When asked to describe the pain or discomfort, she stated:

"A. I would describe it as bearable."

After the noon recess, she testified:

"* * * The first sensation that I felt was a stretching. And it was followed more or less by a pulling and a tugging. And there was more pain involved with that. And it seemed that after that had quit for a little while, there was a slight scraping. Not a scraping on something rough, but just a rubbing feeling, a feeling of something being moved across —a scraping, I guess."

When asked further about the "scraping sensation" she replied:

"A. That was the same. It was—it wasn't really generalized. It was generalized, is what it was. It was there, all over."

She testified that there was not any comparison between the sensations she experienced on 12 February and the sensations she felt during previous pelvic examinations.

Upon the completion of the procedures administered by the defendant, she testified that she observed:

"* * * some paper waddings with red discolorations on it."

She described the size of these spots as being:

"A. Maybe a quarter of an inch and maybe numbering in two."

After she dressed, she testified that she again talked to the defendant. She attributed the following to the defendant:

"A. I asked the doctor if he could tell what it had been.

Q. What did the doctor say?

A. The doctor said, 'No, you weren't far enough along.' "

She further testified that the defendant prescribed some pills:

"A. He handed me a packet of pills called Darvon. He said it was for my pain, if I had any from cramping and a packet of pills called Ergotrate and that was to stop the bleeding and expel any left-over matter."

Thereafter she returned home and went to bed. That night she worked a full shift as a Go-Go dancer. Her employer described this occupation as follows:

"Q. These people work when they go-go dance for you?

That is pretty hard work?

A. Well, they say it is.

Q. You wouldn't want to do it?

A. I am too old for that kind of stuff."

There was no evidence that there was any further bleeding or that she took any of the pills she stated that the defendant had given to her when she left his office on 12 February.

She sought no further care from the defendant. Two days later she returned to his office to get her glasses. On 18 February the defendant referred her to another laboratory for an additional Gravindex test which was negative. There was medical evidence to the effect that if the expulsion of the content of the uterus is complete, it is possible to have a negative HCG test in that short period of time. She testified that thereafter she did not expel anything further and that she did not give birth to a child. This Court concludes that if she was aborted on 12 February, it must have been complete.

Doctors testified for the State and for the defense. They expressed the opinion that based upon the symptoms of pregnancy related by the prosecutrix and the Gravindex test result of 4 February, even without a pelvic examination, that the prosecutrix

was either "possibly" or "probably" pregnant on 12 February. The doctors stated that 4 February was too soon after her last menstrual period to be able to form a positive diagnosis of pregnancy. The appellant urges that a positive diagnosis of pregnancy was essential to the proof of the offense. In our opinion the medical diagnosis of a possible pregnancy or a probable pregnancy was adequate and the fact of pregnancy can be established based upon these diagnoses together with other appropriate evidence.

Why then does this Court entertain any doubts as to the fact of pregnancy on 12 February 1966? The fair import of the medical evidence was that a D and C, a dilation and curettage, requires the dilation of the cervix and a scraping of the walls of the uterus. Standard medical practice in this community requires that this be done in a hospital. The medical evidence discloses that there is considerable bleeding during the procedure and generally some bleeding afterwards. The medical evidence was that this is a painful procedure. The medical evidence indicated that a patient cannot remain quiet due to the pain thus requiring a general or a spinal anesthetic for its accomplishment.

Taking the evidence of the prosecutrix in the light most favorable to sustaining the verdict and judgment coupled with the only logical conclusions which can be reached from the medical testimony, this Court concludes that the prosecutrix could not have undergone a procedure on 12 February 1966, which brought forth a complete expulsion of the embryonic content of her uterus with the slight discomfort that she experienced and the absence of after problems. The defendant testified that he conducted a routine pelvic examination and that the discolored wadding described by the prosecutrix was his swabbing of her vagina to permit him to complete his visual examination.

The Court can reach but one conclusion and that is that on 12 February 1966, the prosecutrix was not pregnant, at least that pregnancy was not established beyond a reasonable doubt.

The issuance of the mandate in relation to this opinion will constitute a directive to the trial court to grant the defendant's motion for a directed verdict and to enter a judgment of not guilty.

Reversed.

DONOFRIO, P. J., and CAMERON, J., concur.